**J. A. JONES CONSTRUCTION COMPANY**

v.

**The UNITED STATES.**

**No. 337–61.**

United States Court of Claims.

Feb. 16, 1968.

J. Carlton Fleming, Charlotte, N. C., attorney of record, for plaintiff.

Issac D. Benkin, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant. James F. Merow, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.

ON DEFENDANT'S MOTION AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

In mid-February 1956 the plaintiff contracted with the Army Corps of Engineers, acting as the construction agency for the Department of the Air Force, to build various facilities at the Air Force Missile Test Center at Cape Kennedy (then Cape Canaveral). This was the first (known as number "2003") of twenty-eight contracts (aggregating about $55 million) awarded, prior to plaintiff's completion of the agreement, as part of the Air Force's Inter-Continental Ballistic Missile (ICBM) program in that geographic area. Twenty of the twenty-seven later contracts (including four with the Jones Company) had clauses requiring the use of overtime in addition to the standard provision (GC–5) allowing the contracting officer to require

extra shifts or overtime if the contractor fell behind schedule.[1] Plaintiff's original contract, here involved, had only GC–5.

The company seeks to recover $122,-897.91, allegedly representing premium (overtime) wages paid by it and its subcontractors. The gravamen of the complaint, based on Bateson-Stolte, Inc. v. United States, 172 F.Supp. 454, 145 Ct.Cl. 387 (1959), Bateson-Stolte, Inc. v. United States, 305 F.2d 386, 158 Ct.Cl. 455 (1962); and Helene Curtis Indust., Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437, (1963), is that the defendant knew but failed to divulge that the large, high priority ICBM construction program, premised in large part on the payment of premium wages, was to be initiated in that labor area [2] (including plaintiff's project) while this contract was being performed. As a result, according to the company, the labor shortage following upon the immense ICBM program and its use of overtime forced the plaintiff to pay premium wages in order to acquire the labor necessary for timely performance, although after due inquiry on the site it had reasonably prepared its bid on the assumption that an adequate supply of straight time labor would be available.

This controversy has endured a long and tortuous journey before coming to us now for review, under the Wunderlich Act, 41 U.S.C. §§ 321–322 (1964), of the ASBCA's ultimate decision against plaintiff. The case has already been subject to two decisions by the ASBCA, two recommendations by our commissioner, and two nondispositive orders of the court. In the view we take it is unnecessary to spell out these various steps and countersteps, but for the historical record and the diligent we set them out in the Appendix.

We eliminate, too, certain points not now in the case. Plaintiff does not assert that the Government is liable merely for proceeding with an enormous construction program, utilizing mandatory overtime, in proximity to J. A. Jones's project, thereby subjecting the company to the additional expense of keeping up with the wages paid by its neighbors. Any such assertion would collide with the sovereign-act doctrine.[3] Furthermore, the

1. The standard overtime clause read:
"If, in the opinion of the Contracting Officer, the Contractor falls behind the progress schedule, the Contractor shall take such steps as may be necessary to improve his progress and the Contracting Officer may require him to increase the number of shifts, and/or overtime operations, days of work, and/or the amount of construction plant, and to submit for approval such supplementary schedule or schedules in chart form as may be deemed necessary to demonstrate the manner in which the agreed rate of progress will be regained, all without additional cost to the Government."
A modification to plaintiff's first contract requiring additional work (signed two months after the basic contract was awarded) contains a clause typical of those requiring overtime. After stating the time limitation on the additional work, the modification provides: "The contractor will be required to work seven (7) days per week and as many shifts or as much overtime as may be required to complete the work within the scheduled time." (That modification is not involved here.) Four of the twenty contracts with premium-wage requirements contemplated

seven-day work weeks; the others specified a six-day (at ten hours per day) work week. While these clauses do not state that overtime will be required, they warn the contractor that, in view of the tight schedules, he undoubtedly will incur overtime expenses and should adjust his bid or quotation accordingly.

2. The Armed Services Board of Contract Appeals and the plaintiff have accepted the Government's definition of the labor area as "(1) Patrick Air Force Base proper, (2) the Air Force Missile Test Center, [and] * * * (3) the launching sites used by the Air Force at Cape Canaveral, all three of which are officially a part of Patrick Air Force Base." J. A. Jones Constr. Co., 60–2 B.C.A. ¶ 2813, at 14531 (No. 5799).

3. See Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925); Wunderlich Contracting Co. v. United States, 351 F.2d 956, 966–967, 173 Ct.Cl. 180, 195–196 (1965); Air Terminal Serv., Inc. v. United States, 330 F.2d 974, 979–980, 165 Ct.Cl. 525, 534–536, cert. denied, 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964); Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, 471–473, cert.

Board in its first decision rejected, and plaintiff does not now reassert, any contention that the contract contained a provision rendering the defendant liable for the consequences of letting the subsequent contracts[4] or that defendant's actions were intended to hinder plaintiff's performance.[5] The claim now rests exclusively on the nondisclosure, prior to the award of plaintiff's contract, of information known to the defendant about other Air Force-Corps of Engineers projects at Cape Kennedy.

■ In considering that problem, we need not elaborate the established rule that, while the defendant had no obligation to prevent (and, indeed, was free to precipitate) the avalanche that buried the contractor, it was not free, if it was aware of the impending avalanche and knew that J. A. Jones was not, to stand aside and let the bidder be overwhelmed without a warning. See United States v. Beuttas, 324 U.S. 768, 772–773, 65 S.Ct. 1000, 89 L.Ed. 1354 (1945); T. F. Scholes, Inc. v. United States, 357 F.2d 963, 970, 174 Ct.Cl. 1215, 1226 (1966); Helene Curtis Indust., Inc. v. United States, supra, 312 F.2d at 777–778, 160 Ct.Cl. at 442–445, and cases cited; Bateson-Stolte, Inc. v. United States, supra, 305 F.2d at 388, 158 Ct.Cl. at 457; S. T. G. Constr. Co. v. United States, 157 Ct. Cl. 409, 416 (1962); Bateson-Stolte, Inc. v. United States, supra, 172 F.Supp. at 456–457, 145 Ct.Cl. at 391.[6] The only real issue is whether the defendant—in the form of some agency of the Federal Government accountable to this plaintiff —did have such knowledge and therefore such a duty.

Both parties presented the case to the Board and to us as if the only responsible entity was the Corps of Engineers. They dispute whether accountability can be pinned to the Office of the Chief of Engineers or only to the local District Engineer at Jacksonville, Florida. Plaintiff maintains that, despite the Board's second determination (see Appendix infra), the administrative record compels the conclusion that, before Jones' contract 2003 was awarded, the Office of the Chief of Engineers had enough knowledge of the premium-time plans (even though the Jacksonville District personnel may not have) to come under a duty to pass this information on to the local officials, who in turn had an obligation to divulge it to plaintiff before its bid. The defendant insists that the Chief of Engineers' Office did not have sufficient

denied, 375 U.S. 879 (1963); Standard Accident Ins. Co. v. United States, 59 F.Supp. 407, 103 Ct.Cl. 607, cert. denied, 326 U.S. 729, 66 S.Ct. 37, 104 Ct.Cl. 856 (1945); Speidel, Implied Duties of Cooperation and the Defense of Sovereign Acts in Government Contracts, 51 Geo. L.J. 516, 533–34 (1963).

4. Compare United States v. Beuttas, 324 U.S. 768, 772–773, 65 S.Ct. 1000, 89 L.Ed. 1354 (1945); Amino Bros. Co. v. United States, 372 F.2d 485, 491, 178 Ct.Cl. 515, 525, cert. denied, 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967); Black, Raber-Kief & Associates v. United States, 357 F.2d 355, 361, 174 Ct.Cl. 302, 312 (1966); Sunswick Corp. of Del. v. United States, 75 F.Supp. 221, 228, 109 Ct.Cl. 772, 798, cert denied, 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755 (1948).

5. Compare United States v. Beuttas, 324 U.S. 768, 772–773, 65 S.Ct. 1000, 89 L.Ed. 1354 (1945); Ottinger v. United States, 88 F.Supp. 881, 116 Ct.Cl. 282 (1950); Bateson-Stolte, Inc. v. United States, supra, 172 F.Supp. at 459–460, 145 Ct.Cl.

at 396 (Laramore, J., dissenting); Restatement of Contracts, § 315, illus. 3 (1932).

6. The Government argues that the ascertainment of labor conditions was solely the contractor's responsibility because the contract contained the following provision on pre-bid site investigations: "The Contractor acknowledges that he has satisfied himself as to * * * the general and local conditions * * * including * * * [the] availability of labor * * *." That clause, however, precludes a claim for nondisclosure or misrepresentation only if "the missing information would have been obtained through the inquiries contemplated by the article." Hunt & Willett, Inc. v. United States, 351 F.2d 980, 985, 168 Ct.Cl. 256, 265 (1964); see Flippen Materials Co. v. United States, 312 F.2d 408, 413 n. 7, 160 Ct.Cl. 357, 364 n. 7 (1963). The ASBCA properly found that a site investigation could not have warned plaintiff of the upcoming labor situation. See also infra.

knowledge, and in any event that the Government can be held only for the information available to the local Engineer representatives who dealt with plaintiff in Florida.

■■ We decline to resolve these opposing contentions as to the knowledge of the Chief of Engineers, and the validity of the Board's findings on that point, because we believe that (a) the knowledge of the Air Force (the agency for which all the work was being done) is decisive in this case, and (b) there is no doubt that the Air Force knew enough about the probability of the use of premium-time at Cape Kennedy (as well as the off-chance that contractors like plaintiff would realize the likely extensive incidence of premium-time payments) to put the Air Force and its agents under an obligation to plaintiff.

We take this position even though plaintiff did not contend (and indeed specifically disclaimed) that the Government should be held liable for what the Air Force knew but failed to disclose. This is an issue of law and, moreover, not the kind of legal issue as to which a litigant can perhaps bind the court by his failure to raise or press the point. Defendant's liability for the Air Force's knowledge (in the circumstances here) seems to us very clear, and we would not be justified in deciding for the defendant —possibly—simply because plaintiff chose to argue less persuasive grounds. A more important obstacle is the fact that the ASBCA never considered including the Air Force within the range of agencies with a duty of imparting data, directly or indirectly, to plaintiff, and therefore made no specific findings on the Air Force's conduct and awareness. Nevertheless, the Board's opinions as well as its record show conclusively the knowledge of the Air Force. It would be a waste to remit this case, once again, to the Board to hear further evidence and make new findings on facts which all admit to be plainly true.[7]

The cardinal assumption underlying both of the ASBCA's determinations was that the Air Force knew, prior to February 16–17 (see note 17 infra), 1956, that extensive awards contemplating use of premium-time would be made in the area. The first opinion even considered that the Corps of Engineers knew this, but excused the Government because, in the Board's view, the "contractor had reasonably efficient notice of what might be in the offing" and was fairly alerted "to the pending program to the extent that the Government had decided upon it." J. A. Jones Constr. Co., 60–2 B.C.A. ¶2813, at 14534 (No. 5799). The second Board opinion again excused the defendant, but this time because the Air Force revealed little of its plans and information to the Corps of Engineers and therefore the latter had no material information to disclose. The plaintiff's contract 2003 was part of an Air Force program for the construction of facilities in support of the testing of the ICBM, and the Air Force set the completion dates for the various components of this program. In addition, "at that time the ICBM projects to be constructed at the Missile Test Center were classified military security information being released by the Air Force [to the Corps of Engineers] on a piecemeal need-to-know basis." J. A. Jones Constr. Co., 67–1 B.C.A. ¶6284, at 29106 (No. 5799).

The inescapable inference from these and other findings is that the Air Force must have had concrete plans for this ICBM program prior to the award of the Jones contract on February 17, 1956. The sheer magnitude of the program would require detailed advance planning, including an estimation that a large amount of overtime would be required for the timely completion of that priority project. The latest date a decision as to

---

7. When the pertinence of the Air Force's knowledge was raised by the bench at the oral argument, the defendant did not intimate that that agency had insufficient knowledge, or that the issue still remained to be tried, but confined its argument to the legal irrelevance of the Air Force's knowledge since it was not the contracting agency.

a premium-wage program could have been made was February 1, when the Jacksonville District received a copy of a teletype addressed to the Corps' division engineer stating that the use of mandatory-overtime provisions had been authorized for the IRBM–ICBM projects at the test center. Since a supplemental appropriations Act (Act of Aug. 4, 1955, ch. 541, § 304, 69 Stat. 450, 454) required the Secretary of Defense to certify the necessity of premium wage rates after setting "a reasonable completion date" in light of, inter alia, the "urgency" of the project and since the Secretary had designated (according to the materials in the record) the ICBM program as the "highest priority" three months before the award of the Jones contract, it is unthinkable that the Air Force did not have plans before February 16–17 for a construction program involving mandatory overtime. It may well be that at that moment the Air Force did not have firm completion dates on every one of its program's components, but it must have known that enough of those dates would be such as to call for a very large amount of premium pay during 1956.

Similarly, there can be no question that the Air Force must have known, or at least should have understood, that contractors in that labor area would not be able to forecast this large-scale use of overtime and premium compensation. The projects were classified and released even to other federal agencies only on a "piecemeal need-to-know basis". 67–1 B.C.A. at 29104. The completion dates were not published. There was no way for a private business to assess the true situation. In its second opinion the Board found that the plaintiff "could not

have been aware that any other Government agency [i. e., other than the Engineers] had planned such a program"[8] and that a site investigation would give no warning. 67–1 B.C.A. at 29104, 29107. See also note 6 supra. These findings are supported by substantial evidence.

If the Air Force were the formal contracting agency, there would be no doubt, on these facts, that defendant would be liable (provided that the plaintiff proved it suffered damage). See Helene Curtis Indust., Inc. v. United States, supra, 312 F.2d at 777, 160 Ct.Cl. at 442–443; Bateson-Stolte, Inc. v. United States, supra, 305 F.2d at 388, 158 Ct.Cl. at 457; Bateson-Stolte, Inc. v. United States, supra, 172 F.Supp. at 456–457, 145 Ct.Cl. at 390–392. As we have pointed out, this record shows each prerequisite to liability set forth in those cases: (a) the Air Force's personnel knew of the other construction and its probable consequences at the time plaintiff's contract was awarded;[9] (b) plaintiff neither knew nor should have known those facts;[10] and (c) the Air Force was or should have been aware of plaintiff's ignorance but nevertheless failed to disclose the pertinent information.

The defendant errs, in this connection, when it puts forward Air Terminal Serv., Inc. v. United States, 330 F.2d 974, 165 Ct.Cl. 525, cert. denied, 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964), as somehow modifying the rule of the earlier decisions. It is true that we rejected that claimant's argument that the defendant should be liable for failing to disclose its tentative plans to install more metered parking spaces (in competition with the plaintiff's parking lots) at National Airport. But we did so because the defend-

---

8. The Board's second opinion reversed the first opinion on this point.

9. See Natus Corp. v. United States, 371 F.2d 450, 458, 178 Ct.Cl. 1, 13 (1967); Robertson Elec. Co. v. United States, 176 Ct.Cl. 1287, 1295–1296 (1966); Kaiser Indust. Corp. v. United States, 340 F.2d 322, 331, 169 Ct.Cl. 310, 325–326 (1965); National Presto Indust., Inc. v. United States, 338 F.2d 99, 105, 167 Ct. Cl. 749, 758 (1964), cert. denied, 380

U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965); S. T. G. Constr. Co. v. United States, 157 Ct.Cl. 409, 416 (1962).

10. See T. F. Scholes, Inc. v. United States, 357 F.2d 963, 970, 174 Ct. Cl. 1215, 1226 (1966); Benjamin v. United States, 348 F.2d 502, 514, 172 Ct.Cl. 118, 134 (1965); Hunt & Willett, Inc. v. United States, 351 F.2d 980, 985 and n. 7, 168 Ct.Cl. 256, 265 and n. 7 (1964).

ant's "failure in this respect cannot be charged *as bad faith or fraud*." 330 F.2d at 978, 165 Ct.Cl. at 532 (emphasis added). The phrase "bad faith or fraud" was used merely to reiterate that an essential element of the cause of action is the defendant's knowledge of the plaintiff's ignorance. As the surrounding sentences of the *Air Terminal Services* opinion demonstrate, our concern was whether the defendant was warranted in assuming that plaintiff was aware that new meters might be added. We held that the plaintiff's knowledge, prior to the time of contracting, of existing metered parking should have forewarned it of possible expansion. It followed that, in the court's view, the defendant was not remiss in failing to warn plaintiff of what the plaintiff should already have known. This was an evaluation of the particular circumstances in that case. There was no departure from the principles of *Bateson-Stolte* and *Helene Curtis*.

But here the Air Force was not the formal contracting agency. Is the United States nevertheless to be held responsible for its conduct? In Bateson-Stolte, Inc. v. United States, supra, 172 F.Supp. 454, 145 Ct.Cl. 387, and 305 F.2d 386, 158 Ct.Cl. 455, plaintiff made a claim, analogous to the Jones Company's, for premium wages it was allegedly forced to pay by the high wages on a massive Atomic Energy Commission project in the vicinity of the powerhouse plaintiff was constructing for the Corps of Engineers. In the second *Bateson-Stolte* decision [11] we said:

[I]f the Corps of Engineers knew that * * * [the AEC] project was to be located in this vicinity and that this large labor force would be necessary to construct the AEC project, to secure which wages considerably higher than the prevailing wage rate would have to be paid the Corps of Engineers was under the duty to disclose it. Although the United States was the con-

tractor both for the [Corps'] Clark Hill Project and for the AEC project, we nevertheless held [in the previous *Bateson-Stolte* decision, on a motion to dismiss] that, in view of the vastness of the business engaged in by the United States Government, with its multitudinous departments and bureaus and independent agencies scattered all over the world, the knowledge of the AEC could not be imputed to the Corps of Engineers. We stated that the Government was liable only if the Corps of Engineers had [the] knowledge * * *. [305 F.2d at 388, 158 Ct.Cl. at 457-458.

The defendant urges this rationale upon us here, but because of the differences in the relationships between the agencies in the two cases we are convinced that we may impose a duty of disclosure on the Air Force in this instance without undermining the essential theory of *Bateson-Stolte* that a truly independent federal agency should not be charged with knowledge of what another is doing simply because both are components of the same Federal Government.

The powerhouse built by Bateson-Stolte was a part of the Clark Hill multi-purpose dam and reservoir project on the Savannah River, a project for which the Corps of Engineers was both the "using" agency and the "contracting" or "service" agency. The AEC was in no way involved with Clark Hill, and the AEC's project (a billion dollar atomic production plant known as the Savannah River Plant) was totally independent of the Engineer's dam and reservoir. The only link between the AEC and the Corps on the Savannah River Plant was the preliminary site evaluation and acquisition done by the Corps on behalf of the Commission. The AEC itself contracted with E. I. du Pont de Nemours Company for design and construction. Moreover, at the time Bateson-Stolte's Clark Hill contract was awarded (October 5, 1950) and formally

---

11. That is, the second decision relating to the merits of the case. In 1958 we had ordered Bateson-Stolte to amend its complaint, upon pain of dismissal, to com-

ply with the rules of the court. See Bateson-Stolte, Inc. v. United States, 142 Ct.Cl. 304 (1958).

signed (October 11, 1950), no site for the AEC plant had been selected. In fact, the AEC was considering 59 possible sites in 14 states on the basis of reports submitted by the Corps. Inspection of the potential locations continued into November, and Savannah River was not finally selected until November 24th.

In these circumstances we thought that there was no adequate basis for attributing AEC's knowledge to the Engineers or for calling upon the former to give its information to the latter (or its contractor). They were wholly independent agencies. The Corps was not the contracting, construction, or service agent for the Commission, which was building its plant for itself. It would, furthermore, have been unrealistic to impose a duty on AEC to warn Bateson-Stolte that the AEC contractors might conceivably drain the labor supply counted on for the Clark Hill Project. Such a holding would have been tantamount to requiring the AEC to check for the projects of all other Government agencies in the vicinity of all 59 tentative sites for the atomic production plan; the Engineers' participation in the Commission's site-evaluation survey was inadequate to single out the Corps as an agency whose independent projects should have been known to the AEC. In sum, there was no significant bond between the two agencies, or their projects, and no reason for the AEC to look out for Engineers' contractors.[12]

On the other hand, the relationship between the Corps and the Air Force in our case contrasts markedly with the lack of interagency connection in *Bateson-Stolte* and the comparable cases (note 12).

Both are parts of the Department of Defense. And the ASBCA specifically found—on the basis of uncontradicted testimony—that, at the time the Jones contract was awarded, the Corps was acting as "construction agency in contracting for the construction of facilities for the Air Force as using agency at the Air Force Missile Test Center." [13] The Corps officials at the Jacksonville District, upon receiving information on the construction requirements and the completion dates (usually from an Air Force representative stationed in Atlanta), would "design the project, obtain bids and award a contract for the work." In doing so, the Corps frequently consulted with "the using agency [the Air Force] in establishing design criteria and schedules for design and construction." 67–1 B.C.A. at 29103–04.

The Corps, however, was not a full "partner" in the enterprise. The Air Force, as we have mentioned, gave it information "piecemeal on a need-to-know basis", and the Corps "did not participate at any level in the development of the ICBM program." 67–1 B.C.A. at 29104. Though the Engineers and the Air Force made a joint determination as to whether an overtime requirement would be inserted in a particular contract, that determination depended on the completion dates set by the Air Force, and the latter sometimes waited until the last minute to inform the Engineers of the time requirements. Though the Corps obviously played a major role in the construction, it is fair to characterize it as an agent of the Air Force in relation to the matters of premium pay, overtime, completion dates,

12. In other decisions declining to attribute the knowledge of one Government agency to another, the lack of any meaningful connection between the agency in charge of the project and the agency allegedly possessing the critical data is even more apparent than in *Bateson-Stolte*. See Town of Kure Beach v. United States, 168 Ct.Cl. 597, 607–612 (1964); S. T. G. Constr. Co. v. United States, 157 Ct.Cl. 409, 416–417 (1962); Fansteel Metallurgical Corp. v. United States, 172 F. Supp. 268, 271, 145 Ct.Cl. 496, 501 (1959), petition dismissed and judgment for de-

fendant entered by stipulation, 150 Ct.Cl. 878 (1960); Piggly Wiggly Corp. v. United States, 81 F.Supp. 819, 822 and n. 2, 112 Ct.Cl. 391, 419–420 and n. 2 (1949); Henry v. United States, 250 F.Supp. 526, 528–529 (N.D.Miss.1965); Continental Consol. Corp., 66–1 B.C.A. ¶ 5694, at 26610–11 (Nos. 10376, 10504, and 10694).

13. Even prior to the advent of the ICBM program, the Corps had worked with the Air Force in constructing IRBM (Intermediate Range Ballistic Missile) facilities at the test center.

extent of the program, and the timing and number of individual projects. For those aspects, at the least, the Air Force was the principal, responsible to this contractor who was doing Air Force work in the area and was directly affected by Air Force actions and programming.

There is some intimation that disclosure by the Air Force might have adversely affected its operations, but we cannot accept that point as real. Unlike the AEC in *Bateson-Stolte*, the Air Force could not help but know of the projects already in the late stages of contracting in the labor area where it later launched enormous construction activity. Those projects were the Air Force's own. The Corps was not engaged in an independent enterprise but was operating completely on behalf and to a large extent at the direction of the Air Force; the former's only function was to be the construction agent of the latter on facilities being built for the latter. Nor were there any obstacles preventing the Air Force from disclosing, at least in general terms, its plans.[14] The lines of communication down the Air Force's chain of command to the Engineers and through the various echelons of the Corps to the contractors were well defined and often used. Moreover, the Air Force could have protected plaintiff from the known hazard, without disclosing information as to future plans, by instructing the Corps to insert in plaintiff's contract a price-escalation clause covering such an eventuality. Cf. Speidel, Implied Duties of Cooperation and the Defense of Sovereign Acts in Government Contracts, 51 Geo.L.J., 516, 543–44 (1963).

In the light of these factors, we hold that the Air Force had a duty to disclose to plaintiff the plans it had for a high priority construction program, premised on the payment of premium wages. The defendant should bear the loss, if any, resulting from the breach of that duty.

There is still the issue of the amount of recovery. The contractor must show that the nondisclosure misled it and caused its additional labor expenditures.[15] Defendant contests the assumption that the existence and amount of damages have already been settled, and asserts that any overtime expenses were incurred under the GC–5 provision (see note 1 supra) because plaintiff fell behind its construction timetable. There is some basis for this argument as the plaintiff admitted in correspondence between it and the contracting officer (written before Jones complained of the labor pinch) that it was not meeting its progress schedule. In addition, the parties stipulated before the ASBCA that the question of quantum was not before the Board, and the Board made no findings on the issue.

We must therefore suspend proceedings to allow the parties to return to the ASBCA—this time for a determination of damages, if any. Although the reason for plaintiff's added labor expenses may be viewed as one aspect of its cause of action, as well as an issue of quantum, we shall terminate at least a portion of the controversy by granting plaintiff's motion for summary judgment (which we construe as limited to the issue of liability) since we hold that the defendant is responsible for any injury caused plaintiff by the Air Force's nondisclosure of material information.

Defendant's motion for summary judgment is denied. Plaintiff's motion for summary judgment on the issue of liability is granted. Further proceedings are suspended for a period not exceeding

---

14. At the ASBCA hearing, the Government introduced hearsay evidence in the form of newspaper articles to show that the Air Force withheld information on the ICBM program from the Engineers for security reasons. While some aspects of the Air Forces' plans undoubtedly were classified, the evidence falls far short of proving that a general warning to plaintiff would have rent the security blanket.

15. See Robertson Elec. Co. v. United States, 176 Ct.Cl. 1287, 1295–1296 (1966). That the Government had superior information is insufficient. The information must have been such that, if it had been disclosed to the plaintiff, the plaintiff could have acted to prevent the injury. See Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 567, 174 Ct.Cl. 153, 174 (1966).

six months from the date hereof in order that the parties may return to the Armed Services Board of Contract Appeals on the question of quantum. Upon the conclusion of proceedings before the Armed Services Board of Contract Appeals, the plaintiff shall file with the court a report of such action, and the parties shall thereafter take such action in this court as may be appropriate toward final disposition of the case.